IN THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LINDA CAREY AS EXECUTRIX OF THE ESTATE OF RONALD B. CAREY AND MARK CAREY, AS DESIGNEE OF THE ESTATE OF RONALD B. CAREY | CIVIL ACTION FILE NO.: |
| Plaintiffs | 1:23-cv-01311-BMB |
| v. | |
| KEYBANK, NA S/B/M/ FIRST NIAGARA, BANK, NA a/k/a KEY CORP and GROSS POLOWY, LLC; MORAN KARAMOUZIS, LLP; | |
| Defendants | |

## **AMENDED COMPLAINT**

Plaintiffs sue the Defendants through this Amended Complaint as follows:

### **Introduction**

1.      This matter concerns the egregious abuse by a mortgage lender and two law firms

of two debtors which refused to recognize their assumption of a note and mortgage from a dead

relative from its predecessor for reasons unexplained.

2.      The debtors, Plaintiffs cited below, suffered severe emotional trauma and harm as

 a result of the misconduct of the lender and the law firms, Defendants cited below, which must

held accountable for this flagrant and egregious misconduct.

1

## Parties and Jurisdiction

3.      Per 28 U.S.C. § 1331, jurisdiction exists based upon FDCPA, TILA and RESPA.

4.      Linda Carey and Mark Carey have standing to bring suit, as consumers borrowers under 15 U.S.C. §1692 a(3), the Fair Debt Collection Practices Act [FDCPA], 15 U.S.C. § 1640 *et seq*,  Truth in Lending Act [TILA] and RESPA, 15 U.S.C. §2601 *et seq.*  Their claims arise from the mortgage Loan at issue obtained "primarily for personal, family, or household purposes" U.S.C. §1692 a(5).

5.      Defendant Gross and Karamouzis are law firms, organized in and with their principal places of business located in New York. Both firms are debt collectors per 15 U.S.C. §1692 a (6) of the FDCPA, as are their agents, Douglas Weinert and Andrew Karamouzis.

6.      Per 28 U.S.C. 1332 jurisdiction also exists as Plaintiffs are individuals domiciled in and citizens of New York and Key is a national bank, with its principal place of business in Ohio, of which it is a citizen per 28 U.S.C. 1348.

7.      Supplemental jurisdiction exists over all claims under § 1367.

8.      Venue is proper under 28 U.S.C. §1391 as the Defendants conduct business here.

## The Property

9.      Plaintiffs own or have interests in real property known 131 North Park Avenue, Buffalo, NY 14216, which has a value in excess of $350,000.00, more particularly described as

> ALL THAT TRACT OR PARCEL OF LAND situate in the City of Buffalo, County of Erie and State of New York, being part of Lot No. 77, Township 11, Range 8 of the Holland Land Company's Survey and according to a map filed in the Erie County Clerk's Office under Cover No. 781 is known as the south 35 feet of Subdivision Lot No. 51, in Block C being 35 feet front and rear by 155 feet in depth, situate on the east side of North Park (formerly Bolton) Avenue, commencing 133 feet north of Hertel Avenue.

2

10.     Plaintiffs are the successors in interest as to the Property and a related Note and Mortgage with the Bank, through its Ohio staff, who approved that transaction.

11.     Mark Carey is the son of Ronald B. Carey whose brother is Linda Carey.

### The Loan.

12.     The Note and Mortgage at issue are dated 10/09/13 [Closing], a secured Loan on the Property, executed by its owner, Ronald B. Carey, with Niagara which it ratified.

13.     Ronald Carey provided valuable consideration to Niagara under the Loan to secure the Property, which has a principal sum due of $104,000.00 [Note ¶¶ 1, Mort. 1] which is the value of the Property.

14.     The Loan has fees, costs and charges for its enforcement as shown by the Note and Mortgage including monthly payments of $519.26 [Note, ¶¶ 2-5, Mortgage 2-5].

15.     The Loan continues in full force and effect on the debt owed until it is fully satisfied as provided by its terms [Note ¶¶ 6-7, Mortgage ¶¶ 6-7.].

16.     Ronald B. Carey and Mark Carey routinely made timely payments under the Loan to Niagara as provided by its terms, which Niagara accepted and ratified from both of them.

### Plaintiffs and Key are the Successors to the Parties to the Loan under its Assumption as ratified by Plaintiffs and Niagara, as admitted and conceded by Key.

17.     On 09/17/79, Ronald B. Carey executed his Last Will and Testament, naming Linda as his executor and trustee and leaving, in equal shares, all of the rest, residue and remainder of my proper and estate, of whatsoever kind and nature, reason or personal, and whatsoever kind and nature, real or personal, and whatsoever situated, of which I may die seized or in which I may have interest or over which I may have any power of appointment.[Will ¶¶ 2]

3

18.     Ronald B. Carey died 05/20/15 whose survivors and successors are Plaintiffs and his Estate which Linda opened on 11/17/15 with the Surrogate's Court of Erie County, resulting in her Appointment as the Executor of the Estate by issuance of Letters Testamentary.

19.     Plaintiffs provided written notice of Linda's Appointment as Executor of the Estate and Ronald's Death Certificate to Niagara per the Loan.  [Note ¶¶ 7, Mortgage ¶¶ 15, 20]

20.     First Niagara accepted the documents and added Mark's name to the Loan or at least to its database as an authorized party on the Loan, evidencing the assumption of the Loan by the Plaintiffs, at least Mark Carey [The Assumption] facts and results which Key never disputed and admitted and which is similarly bound by the Assumption, as Niagara's successor.

21.     Niagara provided Mark Carey with full access to all information about the Loan, allowing him to make Loan payments with his debit card without interruption or any issues, evidencing Mark's assumption of the Loan, a pertinent fact never disputed and admitted by the Key's admission by silence on that matter, contrary to its baseless allegations that Plaintiffs provided "no evidence" to show that they ever "assumed the Loan." [Doc 6, pp. 3]

22.     Plaintiffs "took over" have all of the "rights and "obligations" of Ronald B. Carey on the Loan which they assumed as provided by its terms [Note ¶¶ 8, Mortgage ¶¶ 12, 13] to which Niagara consented, benefitted ratified by accepting their Loan payments and communications, concession of undisputed fact by Key in this action, who provided no records from Niagara to the contrary of which Key is clearly in possession by virtue of that merger as it admits [Doc 6, pp. 2] a misrepresentation of fact for which Key should be sanctioned.

21.     Niagara reassured Plaintiffs they could make Loan payments as Niagara, consented, benefitted, adopted and ratified the Assumption with Plaintiffs another fact undisputed by Key at any time in the foreclosure action and now this action as shown here.

22.     Plaintiffs were able to make Loan payments to First Niagara, until its merger with Key on 07/29/16, to be completed by 08/01/16, as shown by an SEC notice dated 07/12/16.

23.     Key acquired and assumed the Loan from Niagara subject to the rights of the Plaintiffs to assume and enforce the Loan as agreed by Niagara per the Assumption [Note ¶¶ 1, Mortgage ¶¶ 20] which Key never disputed and conceded in the foreclosure and here.

24.     Key's acquisition of the Loan from Niagara, subject to the Assumption is reflected by a Clerk's Endorsement dated 10/1/19, recorded 03/30/22 Erie Index No. 803815/2022 and presumably its merger documents with Niagara which permit the Assumption.

25.     However, Key inexplicably and illegally refused to accept Mark's Loan payments contrary to the Assumption, as documented by Linda's written notices to Key's agent, Catherine, on 11/18/16 and 11/30/16, contrary to Niagara's express, continuing acceptance of Mark's course of performance under the Loan after assuming it from his father, which Key again conceded in here and in the foreclosure.

26.     On 12/30/16, Linda had an agent of Key named Nikki contact Mark, who made an online Loan payment at that time per the Assumption, which Key accepted and ratified.

27.     However, Key refused to accept Mark's monthly January 2017 Loan payment under the Assumption by illegally blocking his access to Key's online payment system.

28.     Key refused to acknowledge Mark's ability to make a payment and refused to discuss the Loan with him contrary to the Assumption, as ratified by Niagara and Key.

5

29.    On 02/10/17, 02/16/17 and 2/20/17, Linda provided written notice to Key's agents, Rachel, Joanne and Michelle, in a chat session, of its refusal to accept the Loan payments from Plaintiffs, after Defendant assured Plaintiffs they could access the account and make Loan payments as provided by the Assumption.

30.    On 02/10/17, Linda noted that a "supervisor nor manager named Nikki reached out to [Mark] on 12/30/16 and he was able to make a payment with her on the phone by providing his Bank of America routing and checking number."

31.    Notably Linda made the below statements regarding the Assumption in the 2/10/17 chat, which Michelle, never disputed and admitted as Key's agent, as follows:

Linda: My oldest brother [Ronald] died in 2013.

Michelle: I am very sorry for your loss.
Linda: He owned a home in Buffalo, NY and had his mortgage with First Niagara. He named me his Executrix in his will and I filed all of the proper paperwork with First Niagara.

Linda: *And everything was fine. His oldest child (my nephew) [Mark] took over the mortgage payments and continued make the payments on time, etc. with Niagara.*

Linda: However, SINCE THE MERGER, all that has changed!"

Linda: *I had multiple conversations with multiple people at Key Bank and they have assured me time and time again that Mark [my nephew] now has access to the account to make payments and every time Mark tries to pay the mortgage, he is denied.*

Linda: I have spent (literally) HOURS trying to get this resolved!

Linda: But I thank you for your help. I knew when I was at Bank of America, we had an office of the President team that customers who repeatedly tried to resolve a problem but could not would eventually escalate to the President

Michelle: I am very sorry to hear of this troubling situation. We have a department similar to what you describe I have a phone number as well as an address I can offer you to reach them.

Michelle: which would you prefer?

32.    <u>The above chat shows that the Assumption was never disputed and admitted by the Key's admission by silence on that matter, contrary to the baseless allegations of Key's counsel that Plaintiffs provided "no evidence" to show that they ever "assumed the Loan." [Doc 6, pp. 3] for which Key and its counsel should be sanctioned as provided by law.</u>

33.    However, Key still illegally refused to accept Mark's Loan payments or add him to the Loan as an account holder, in breach of the terms of the Loan under the Assumption which Niagara ratified, as Key conceded by its silence on this matter.

34.    On 04/20/17 and 05/04/17, Linda again communicated the above issues to agents of Key, including Jeremy W, an agent of Key, who promised to resolve the issues with uploading the documents into the system, conceding the Assumption of the Loan by Plaintiffs with Niagara to which Key is subject, as undisputed and admitted by Key due to its silence on that matter.

35.    However, Key persisted in refusing to discuss the Loan with Mark and refusing to accept his Loan Payments, contrary to the Assumption which Niagara ratified, as Key conceded.

36.    On 10/05/17, Linda Carey provided copies of her Certificate of Appointment as Executor of the Estate and Ronald Carey's Death Certificate to Jeremy W after three prior attempts to do so with Key as provided by the Loan [Note ¶¶ 7, Mortgage ¶¶ 15, 20].

37.    Jeremy affirmed the above estate documents showed the standing of Plaintiffs to enforce the Loan under the Assumption which he would scan to and attach to the Loan account.

38.     On 10/26/17-10/28/17, Linda documented her efforts to communicate with Key, again providing Key with the Estate's written Authorization allowing Mark to communicate with Key regarding the Loan, including the Assumption by Plaintiffs, to Siobhan Moran, another attorney for and an agent of Key, by its terms [Note ¶¶ 7, Mortgage ¶¶ 15, 20].

39.     However, on 10/26/17, Siobhan Moran, an attorney and agent of Defendant Key confirmed the receipt of the documents but baselessly stated as follows:

> "Key has received the Estate related documents and death certificate that you provided which enabled them to speak with you about the account. Those forms, however, do not allow representatives of KeyBank to speak with Mark about the details of the account, although he has been able to continue making payments. [ a patently false statement] _As explained to you upon receipt of the Estate forms, the only way to "add" Mark to the account would be to refinance the loan as all of the loan documentation is in the name of Ronald B. Carey only_.
> Going forward, in order for Key representatives to be permitted to discuss the details of the account (including amounts outstanding or monthly payments etc), we need to receive a written letter of authorization from you stating that fact. The letter should state what access you would like Mark Carey to have and that you are writing in your capacity as the Estate's representative. Please include the account name (Ronald Carey) and the account number. If you would like to fax that letter to me please send it to me at 516-678-6661. If it is easier to scan and e-mail it, please do that. Alternatively you may send it to me via U.S. Mail at the address listed below. Upon receipt, the account will be noted to permit information to be disclosed to Mark as per your instructions.
>
> Currently, the account is past due in the amount of $1,810.54. That amount must be paid on or before 10/31/2017 in order to avoid moving to the next step of pre-foreclosure.
>
> Thereafter, as of 11/1/2017, the monthly amount due is $884.49. That amount should remain the same every month, unless there is an adjustment to the escrow which may increase or decrease that amount. In that event, you will be notified in advance.
> Please let me know if you have any questions and let me know the best way for you to transmit the letter of instructions."

40.     The above statement about "refinancing" the loan to add Mark to it was a clear breach of the terms of the Loan which Mark had already assumed under the Assumption.

41.     On 10/28/17, Linda responding to the above communication by faxing the Authorization to Key, again providing this information to it, after doing so twice before.

42.     On 10/31/17, Moran wrote, confirmed Key's receipt of the Authorization and its entry into its system and represented Mark could "obtain information on Loan payments, outstanding balances and anything else concerning the Loan" under the Assumption.

43.     On 11/01/17, Mark wrote Moran and confirmed that Key still refused to accept his Loan Payments, despite his following Key's Loan payment instructions she provided to him.

44.     On 11/01/17, Linda provided notice to Key thorough Moran of Plaintiffs' injuries, detailing their emotional duress and trauma suffered by Key's ongoing misconduct, the horrendous nature of the merger and being inexplicably called and asked by Defendant Key to speak with the decedent, Robert Carey, on a monthly basis.

45.     Mark Carey made Loan Payments in person at Key's Albany branch under the Assumption, although Key refused to provide any Loan information, such as its alleged late charges, again ignored, misrepresented and conceded in its baseless motion [Doc 6, p. 2].

46.     Mark tendered cash payments on the Loan to the Key representatives at its Albany branch which they accepted without further comment consistent with the Assumption.

47.     On 11/01/17, Moran wrote Mark, encouraging him to enforce the Assumption:

"I still think it is in your long-term best interest to resolve this matter."

48.     On 11/02/17, Siobhan Moran further admitted the existence of the Assumption on behalf of Key Bank in several of her communications to Plaintiffs as follows:

*The account has been notated regarding the written authorization we received in order for Mark to have access to  information concerning the account.*

*I do understand your frustration but I think the issues that you've raised are resolved at this point and you should not have any further problems regarding the account…I hope this helps. Please let me know if you have any questions."*

49.    Mark had discussions about the Loan with Siobhan Moran as late as 2019 regarding its alleged "arrearages."

50.    Key's collection department also contacted Mark about Loan payments even during the foreclosure mentioned below, but then terminated each call, claiming he was not "authorized" the Loan with him, in blatant, illegal disregard of the Assumption.

51.    Key's above misconduct violated the Assumption under the facts and law.

### Breach of the Loan Instruments.

52.    Key ratified the Assumption of the Loan to which it is subject, by its subsequent acquisition of Niagara, its communication with Plaintiffs on the Assumption as well its acceptance of their Loan Payments consistent with the Assumption.

53.    Key breached and defaulted on the Loan by illegally ignoring the Assumption by (a) refusing to accept Loan payments from Plaintiffs via debit cards (b) refusing to discuss the Loan with them, including with Mark at a Key branch and (c) rejected their efforts to confirm that they were the new borrowers under the Loan he Loan per its terms since 2017.

54.    Key refused to respond to correspondence and calls or to apply payments on the Loan by Plaintiffs, which they, as successors to Ronald Carey, are entitled to enforce under the Assumption and have standing to enforce the Loan and claims, prior to this action.

53.    All conditions precedent to suit to occurred, are fulfilled, or waived, or their occurrence or fulfillment was unnecessary or futile.

## COUNT I:  DECLARATORY RELIEF AS TO DEFENDANT KEY

54.      ¶¶ 1-53 are incorporated.

55.      The Garn-St. Germain Depository Institutions Act in 1982 (the "Act" or the "Garn-St. Germain Act"). allows banks to enforce due-on-sale clauses in mortgage contracts, but it also protects property transfers between specific parties, exempting those transfers from due-on-sale clause enforcement.

56.      Specifically, the Act protects transfers from one joint tenant to another upon death, to a spouse or child of a borrower, and to a spouse in the context of a divorce settlement.

57.      Banks, then, cannot enforce due-on-sale clauses against successors-in-interest who take title to property via these protected transfers such as Plaintiffs, who conducted the Assumption of the Loan with Niagara, which Key illegally disregarded since the Merger as shown by the record, contrary to its frivolous argument "that the Complaint does not, and cannot, allege that  Key attempted to enforce any due on sale clause as a result of Borrower's death." [Doc 6, pp. 15]

58.      The CFPB also passed § 1026.20(b) under the Truth in Lending Act, TILA, which provides that an assumption of an obligation occurs when a creditor expressly agrees in writing with a subsequent consumer to accept that consumer as a primary obligor on an existing residential mortgage transaction.

59.      Plaintiffs succeeded Ronald Carey's rights and obligations and are subsequent consumers on the Loan under Assumption as admitted by Niagara, Key and its counsel,  contrary to their frivolous allegation: "The Complaint does not allege that KeyBank agreed in writing that Linda or Mark could assume the Loan. That omission is fatal." [Doc 6, pp. 13]

60.     12 C.F.R. § 1026.20(b) provides in part that a creditor shall make new disclosures prior to the assumption to the subsequent consumer, based on the remaining obligation.

61.     12 C.F.R. § 1026.20(f) provides in part that a servicer is required to provide a confirmed successor in interest on a mortgage loan any written disclosure required by paragraphs (c), (d), and (e) of this section [if] the confirmed successor in interest assumes the mortgage loan under State law or provided the servicer an executed acknowledgment in accordance with Regulation X, § 1024.32(c)(1)(iv), that the confirmed successor in interest has not revoked.

62.     § 1026.20 clarifies that a successor-in interest (successor) who previously acquired title to a dwelling agrees to be added as obligor or substituted for the existing obligor on a consumer credit transaction secured by that dwelling, the creditor's written acknowledgement of the successor as obligor is not subject to the Bureau's 2 Ability-to-Repay Rule (ATR Rule), § 1026.43, as such a transaction is not an assumption as defined by Regulation Z § 1026.20(b).

63.     Plaintiffs are successors in interest to Ronald Carey under the Loan per the Assumption authorized by Niagara which they may enforce against Key as provided by law.

64.     Plaintiffs were entitled to notices from Key for the Loan as its borrowers under the Assumption and 12 C.F.R. § 1026.20(b) (2) encouraging them to (i) contact Key (ii) the number for its servicing personnel/mailing address (iii) loss mitigation options (iv) instructions or a statement to more loss mitigation options (v) web access to the Bureau or HUD list of home ownership counselors or counseling organizations and HUD's toll-free number for same.

65.     Key continuously failed to make such disclosures to Plaintiffs based upon its unrelenting misconduct and baseless dispute of the Assumption and breached its duties under the Loan and applicable law to Plaintiffs under the disclosures even if they were made.

12

66.     The Loan was intended to bind its parties, their successor and assigns under the Note and Mortgage, intended as a secured debt on the Property, which should be read together.

67.     Key assumed, adopted, ratified and benefited from Plaintiffs' succession to the Loan under the Assumption by acquiring it from Niagara and accepting its prior payments made by Key's Plaintiffs as provided by its terms and retaining them in return.

68.     Plaintiffs are entitled to enforce and reform the Loan to transpose and supply its terms as its current borrowers, under the Assumption, contrary to Key's misconduct

69.     Plaintiffs requires this equitable relief which will not prejudice Defendant Key for which there is no adequate legal remedy given Key's illegal dispute of the Assumption.

70.     Plaintiffs requests the Court declare and establish they are the successors to Ronald Carey on the Loan under the valid Assumption, relating back to his death, to address, prevent and end Key's ongoing and illegal dispute of the Assumption, to which Key is subject, granting all just relief such as their other relief [Doc 6, pp. 12].

## COUNT II:  BREACH OF INSTRUMENTS
## AS TO DEFENDANT KEY

71.     ¶¶ 1-53 are incorporated.

72.     Key acquired the Loan from Niagara subject to the Assumption which they ratified by their above communications with Plaintiffs and acceptance of their Loan payments, contrary to Key's baseless allegations "no contract exists between the parties" [Doc 6, pp. 15]

73.     Key breached the Loan by baselessly disputing the Assumption, evidencing Plaintiffs' rights as successors to Ronald Carey under the Loan and Property, refused to communicate with them on the Loan, refused to accept and apply their payments on the Loan.

74.     Key also breached the Loan by improperly adding monthly late fees and interest to the balance of the Loan, precluding Mark from curing the Loan's alleged arrears, which did not otherwise comply with its terms, in which Key is now in default.

75.     Key's breach of the Loan proximately and actually damaged Plaintiffs, who were denied the opportunity to communicate regarding the Loan and to make payments on it.

76.     Plaintiffs demands judgment for their damages on the Loan as to Key in a principal sum, plus interest, costs, charges, just relief such as their other remedies.

## COUNT III: BREACH OF FIDUCIARY DUTY AS TO DEFENDANT KEY

77.     ¶¶ 1-53 are incorporated.

78.     A fiduciary duty existed between Plaintiffs and Key in whom they reposed a special trust and confidence, based upon Key's initial written assurances that it would recognize the Assumption as did Niagara which Key had ratified by its course of conduct.

79.     Key breached its fiduciary duty to Plaintiffs by baselessly disputing and rejecting the Assumption, which Niagara ratified and which Key did as well, which it later disregarded in its own self-interest to foreclose and resell the Property for its profit.

80.     Key's misconduct was intentional, willful, wanton, malicious and oppressive, or reckless and wanting in care to be grossly negligent and consciously indifferent to its consequences, knowing Plaintiffs would be harmed and Key is liable for this misconduct.

81.     Defendant Key's breach and self-dealing was willing, knowing and illegal which actually and proximately caused damages to Plaintiffs, including legal fees, mental distress from its intentional, extreme and outrageous conduct which Defendant Key adopted and ratified.

82.     Plaintiffs demands judgment against Key for its breach of its fiduciary duty including general, special, nominal, compensatory and punitive damages.

## COUNT IV: FRAUD AS TO DEFENDANT KEY

83.     ¶¶ 1-53 are incorporated.

84.     Defendant Key misrepresented material facts to Plaintiffs, namely they would be recognized as Ronald Carey's successors under the Loan per the Assumption as shown here.

85.     Key did or should have known its statements were false, which did not intend to recognize Plaintiffs as successors to Ronald Carey under the Loan under the Assumption, contrary to its frivolous denial in its Motion to Dismiss [Doc 6, pp. 17].

86.     Key intended that its statements would induce Plaintiffs to rely upon them in not otherwise seeking legal alternatives to enforce the Assumption, such as prior preemptive action upon which they relied to their detriment in not doing so and are damaged as shown here.

104.     The misconduct of Key was intentional, willful, wanton, malicious and oppressive, reckless and wanting in care, grossly negligent and consciously indifferent to its results of disregarding the Assumption, which Key ratified for this unlawful purpose.

87.     Plaintiffs sustained physical and mental pain and suffering as a proximate or direct result of the fraud of Key in now belatedly disputing the Assumption, against whom Plaintiffs demand judgment for compensatory, consequential, special, nominal and punitive damages for this gross and willful misconduct, costs and just relief.

15

## COUNT V: FDCPA AGAINST DEFENDANTS GROSS AND MORAN

88.　　¶¶ 1-53 are incorporated.

89.　　On 12/27/21, Key brought a state court foreclosure action against Linda and others in the Supreme Court of Erie County, Index No. 803815/2022 through Defendant Gross.

90.　　The Complaint admitted that the Loan was assigned by Key from Niagara but falsely contended Ronald Carey "failed to comply" with the Loan by not making the payment "that was due on 02/01/19 and subsequent payments" for which there were sums "due and owing" of principal of $93,887.33 plus interest at the rate of 4.37%. [Complaint ¶ 4,5,6]

91.　　01/04/23, Defendant Gross filed an Amended Complaint in the foreclosure on behalf of Defendant Key against the Plaintiffs.

92.　　The Amended Complaint misrepresented Key's refusal to recognize Plaintiffs as the successors to Ronald Carey who fully complied with the Loan as shown above.

93.　　The Amended Complaint instead falsely stated as follows:

Ronald B. Carey (who died on May 20, 2015, a resident of the county of Erie, State of New York) failed to comply with the conditions of the note and mortgage by not making the payment that was due on February 1, 2019 and subsequent payments. [Amended Complaint ¶ 5]

94.　　The Amended Complaint also falsely stated as follows:

Principal Balance: $93,887.33
Interest Rate: 4.375% Date Interest Accrues from: January 1, 2019
Together with accrued late charges, monies advanced for taxes, assessments, insurance, securing, inspections, posting of notices, maintenance and preservation of the property.  [Amended Complaint ¶ 8]

16

95. On 02/16/23, Key filed a Reply to defenses and counterclaims raised by Plaintiffs in the foreclosure, falsely stating they "failed to mitigate any damages" they incurred, whose claims are barred by the "voluntary payment doctrine" repeated in another reply dated 05/30/22.

94. On 03/30/22, Gross filed an Affidavit in the foreclosure that cites and relied on the false statements of the "default" [Gross Affidavit ¶ 3] as did Key's Statement of Material Facts filed 03/30/23 which falsely states: "Defendants defaulted under the terms of the Note and Mortgage by failing to make the February 1, 2019 and subsequent payments."

95. On 03/30/23, these false statements of the Loan "default" were repeated in an Affidavit filed in the foreclosure by Gross for Key, executed by Karvoski, an agent of Key.

96. These false statements of the Loan default are referenced in and relied upon by Affidavit of Andrew P. Karamouzis of Defendant Moran Karamouzis, an improper witness for Key Bank, also filed in the foreclosure on 03/30/23.

97. These false statements of the Loan "default" are cited by Gross in a Memorandum filed for Key on 03/30/23, based upon Plaintiffs' "failure to pay the outstanding debt owed to KeyBank"  and "there is now due and owing on the note and mortgage the principal balance of $93,887; plus interest and late charges, monies advanced for taxes, assessments, insurance, securing inspections, posting of notices and maintenance and preservation of the property" who accused Plaintiffs of a "*desperate attempt* to deflect this Court's attention away from Defendants' *default* under the Note and Mortgage to avoid paying their debt owed to KeyBank" [Memorandum, pp. 1 and pp. 5].

98.     On 05/22/23, Amber Jurak, Esq. another Gross employee, filed an Affidavit in the foreclosure on behalf of Key, again falsely contending under oath there was a "default in payment of the monthly Loan installment due 02/01/19."

99.     On 05/22/23, Siobhan Moran, of Defendant Moran, filed another affidavit in the foreclosure, admitting that Key "assumed" the Loan from Niagara, that it was brought current but falsely claims the Loan is now "again delinquent" had an arrearage of $10,375.00, was in "default" and Plaintiffs "failed to pay monies due and owning" on the Loan and its "delinquencies" [Moran Affidavit ¶¶ 6, 16, 23, 24, 30, 45].

100.     On 7/06/23, the foreclosure court entered an order, granting the sale, "dismissing" the defenses of Plaintiffs without findings of fact and conclusions of law, including on the validity of Key's claims in the foreclosure action, contrary to the false statements of its counsel in its pending motion to dismiss which implies such as a determination was made  [Doc 6] for which Key and its counsel should be sanctioned under 28 U.S.C. 1927.

101.     Furthermore, on or about 08/07/23, Mark also filed a motion for rehearing of the order of foreclosure, citing its above lack of findings of fact and law, which that Court has taken under advisement and ordered a hearing, additional facts deliberately omitted and misrepresented about this matter by counsel for Key in their subsequent motion to dismiss filed 08/30/23 [MTD pp. 4] for which they should be sanctioned under 28 U.S.C. 1927. [Doc 6, MTD, p. 4 of 21]

102.     The foreclosure documents were intended by Defendants for the sole purpose of illegally enforcing and collecting the Loan per their false statements of its "default" by Plaintiffs.

103.    The false statements of Gross and Moran in the foreclosure documents are "false, deceptive, or misleading representation or means in connection with the collection of any debt," and § 1962f, which is violated if a debt collector uses "unfair or unconscionable means to collect or attempt to collect any debt" and 15 U.S.C. §§ 1692e, 1692f.

104.    Gross and Moran used unfair and unconscionable means to collect the Loan from Plaintiffs by (a) illegally refusing to accept their legal right to assume and enforce the Loan causing its default (b) seeking to hold them liable for the Loan's "principal, interest, late charges, taxes, assessments, insurance, maintenance and preservation of the property and other similar charges, together with costs, allowances, expenses of sale, reasonable attorney's fees, all with interest" (c) to "have the Property sold at auction to the highest bidder in accordance with the referee's terms of sale" and "their interests in the Property" and "persons claiming by or through them be foreclosed and their title, right, claim, lien, interest or equity of redemption to the property be forever extinguished." [Amended Complaint pp. 3]

105.    The false statements of Gross and Moran as counsel for Key in the foreclosure to date violate the FDCPA which "threaten to take action that cannot legally be taken or that is not intended to be taken" who could not bring this action in the first place. 15 U.S.C. §§ 1692e (5)

106.    Gross and Moran are liable for these FDCPA violations, which misrepresented material facts to Plaintiffs, namely that the Assumption would be recognized by them and Key.

107.    Gross and Moran repeatedly damaged Plaintiff by their abusive, illegal acts and omissions in violation of the FDCPA as to their illegal enforcement of the Loan against them, causing them to suffer harm including emotional distress and trauma.

108.    Gross and Moran are liable to Plaintiffs under 15 U.S.C. § 1692 (k) for their actual compensatory, consequential, nominal and punitive damages with attorney's fees and costs for which Plaintiffs demands judgment and all other just relief.

## COUNT VI:  VIOLATION OF RESPA AGAINST KEY.

109.    ¶¶ 1-53 are incorporated.

110.    Key is subject to the Real Estate Settlement Practices Act [RESPA] 12 U.S.C. § 2605 *et seq* as a lender particularly as the Loan may be assumed without its approval such as by the Plaintiffs under the Assumption. 12 CFR § 1024.5 (b)(5)

111.    Key must provide a written response to a Qualified Written Request [QWR] seeking "information relating to the servicing of [a] loan."  See 12 U.S.C. § 2605(e)(1)(A).

112.    A QWR is correspondence that "includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." *Id.* § 2605(e)(1)(B)(ii).

113.    RESPA defines "servicing" as "receiving any scheduled periodic payments from a borrower...and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." *Id.* § 2605(i)(3).

114.    A lender can validly respond to a QWR by (1) making corrections to the account, 12 U.S.C. § 2605(e)(2)(A); (2) explaining or clarifying why the account is already correct after an investigation, *id.* § 2605(e)(2)(B), (3) providing the borrower with a written explanation or clarification including information requested and explain why information not provided cannot be obtained or provided by the servicer after an investigation *id.* § 2605(e)(2)(C).

20

115.    Plaintiffs repeatedly and continuously issued QWRs demanding that Key correct its erroneous assertions that Loan Obligor was still Ronald Carey, contrary to the Assumption binding Plaintiffs, Niagara and Key under 15 U.S.C.S. § 2605 (e) until the present.

116.    Defendant Key repeatedly and continuously violated RESPA in its numerous Notices to Plaintiffs on the Loan ignoring the Assumption since "acquiring the Loan."

117.    Defendant's Key notices erroneously identified Ronald Carey as the Loan obligor, ignoring the notices of Plaintiffs to the contrary and failing to correct its records to reflect them as the successors under the Loan to Ronald Carey under the Assumption.

118.    Defendant Key's notices erroneously stated the Loan was in 'default' and the Property was in danger of foreclosure, due to rejecting Loan Payments from Plaintiffs.

119.    Defendant Key repeatedly damaged Plaintiffs by its abusive, illegal acts and omissions in violation of RESPA by illegal enforcement of the Loan, causing them to suffer harm including emotional distress and trauma, after the death of Ronald B. Carey, of which they were constantly reminded until the present.

120.    Defendant Key is liable to Plaintiffs under 15 U.S.C.S. § 2605 (f) for actual compensatory, consequential, nominal, statutory and punitive damages with attorney's fees and costs for which Plaintiff demands judgment and all just relief.

## COUNT VII:  VIOLATION OF TILA AGAINST KEY.

121.    ¶¶ 1-53 are incorporated.

122.    Defendant Key is subject as a lender on the Loan to the Truth in Lending Act 15 U.S.C.S. §1641, a residential mortgage debt subject to the Assumption.

123.    Defendant Key violated the Truth in Lending Act by continuously demanding, since its acquisition of the Loan from Niagara, that Plaintiffs "refinance" the Loan as the sole means of 'adding" Mark as party to the Loan, which was clearly untrue while refusing to recognize the Assumption as shown above until now, contrary to its baseless Motion that this claim is time barred. [Doc 6, pp. 10]

124.    Defendant Key engaged in this misconduct purely to benefit itself to obtain more compensation from a new loan on the Property which is not in the best interest of the Plaintiffs.

125.    Defendant Key damaged Plaintiff by its abusive, illegal acts and omissions in violation of TILA, causing them to suffer harm including emotional distress and trauma.

126.    Defendant Key is liable to Plaintiffs per 15 U.S.C. § 1640 *et seq*. for their actual compensatory, consequential, nominal, statutory and punitive damages with attorney's fees and costs for which Plaintiffs demands judgment and all just relief.

## COUNT VIII: CONSPIRACY AS TO DEFENDANTS

125.    ¶¶ 1-53 are incorporated.

126.    Defendants had a conspiracy, a malicious combination and common design to harm Plaintiffs by their above unlawful acts and omissions prior to and in the foreclosure.

127.    Defendants committed overt acts to further their conspiracy, such as engaging in their above illegal actions to disregard the Assumption, foreclose the Loan against the Property and hold Plaintiffs in default of the Loan instead of recognizing the Assumption to effect the

22

other misconduct alleged here, to again harm them for which they are liable contrary to their bare denials that they did not do so [Doc 6, pp. 18].

128.    The misconduct of Defendants was intentional, willful, wanton, malicious and oppressive, reckless and wanting in care, grossly negligent and consciously indifferent to its results, which they ratified for this unlawful purpose.

129.    Plaintiffs sustained physical and mental pain and suffering as a proximate or direct result of this conspiracy of the Defendants against whom Plaintiffs demand judgment for compensatory, consequential, special, nominal and punitive damages for this gross and willful misconduct, costs and just relief.

Respectfully submitted this 20th day of September 2023.

By:     */s/Paul G. Wersant*
        Paul G. Wersant
        N.D. Ohio Bar No. 748341
        3245 Peachtree Parkway, Suite D-245
        Suwanee, Georgia 30024
        Telephone: (678) 894-5876
        Email: pwersant@gmail.com
        Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that a precise copy of this document was filed ECF, sending ECF notice to counsel of record on the below date.

Respectfully submitted this 20th day of September 2023.

By:     */s/Paul G. Wersant*
        Paul G. Wersant